IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
Worcester Division

PUGGI VASQUEZ,
        Petitioner

v.

## 04-40205 NMG

UNITED STATES OF AMERICA,
        Respondent

### MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE
### PURSUANT TO 28 U.S.C. § 2255

Now comes the Petitioner, Puggi Vasquez, Pro Se, and respectfully seeks the issuance of a writ of habeas corpus vacating and correcting the sentence in this case. He is currently serving a sentence of 87 months imposed by this Court. His direct appeal was denied; he took no further direct appeal to the United States Supreme Court and this Petition is due on or before October 11, 2004.

Mr. Vasquez bases this Motion on the following grounds for relief:

1. The Defendant was unconstitutionally sentenced to an inflated drug quantity due to the ineffective assistance of defense counsel;

2. The Defendant was unconstitutionally denied acceptance of responsibility but for the ineffective argument of counsel where he clearly and fully accepted responsibility by returning to the United States;

3. The Defendant was unconstitutionally found culpable by the District Court alone to a preponderance of evidence standard to certain conduct of his case, to wit, "relevant conduct" drug quantity and obstruction of justice.

Mr. Vasquez brings his first two claims for the ineffective

assistance of defense counsel at sentencing; the third ground for relief satisfies the showing of cause required by United States v. Frady, 456 U.S. 152, 165-67 [1982], for being a retroactive change in the law, both procedurally and substantively.  The Petitioner's view of the standards to be met are presented in appropriate sections of the Petition.

### RELEVANT SUMMARY OF THE FACTUAL BACKGROUND

The facts of the underlying case are undisputed by the parties that Mr. Vasquez was generally a law-abiding person with a social cocaine habit.  It ultimately became unfortunate that friends of his now ex-wife's family dealt in cocaine.

When Mr. Vasquez and his wife separated, the friendship he had developed with Rafael Ventura led Ventura to offer his vacant apartment for temporary lodging and storage.  When Mr. Vasquez' stay proved longer than expected, he eventually learned that Ventura stored his cocaine supply in hiding places in the apartment.

On one occasion, when Ventura could not pick up a cocaine package to deliver to a customer and Vasquez was handy, Ventura asked Vasquez to do the favor of bringing the cocaine package to his wife. Mr. Vasquez did so purely as favor for no remuneration.  The customer was the informant to this case and he identified Mr. Vasquez, who was indicted shortly thereafter with the others.

The legal difficulties in this case arose after Mr. Vasquez surrendered to the indictment.  He had been in his lawyer's office on civil business when the lawyer informed him that agents had a federal warrant for his arrest.  After surrender, police sought his cooperation and he complied, making two controlled purchases.  As another

2

condition, Mr. Vasquez was required to move to Connecticut. Eventually, however, employment dried up in Connecticut. So the Defendant took a job suggested by his ex-wife at Osmonics, Inc., in Worcester, Massachusetts under an assumed name and moved back to Worcester without permission in order to work.

After eight months of this someone informed agents of his activities and four came to Osmonics to question him. The spectacle of their visit was impossible to ignore and the gossip had already started when Mr. Vasquez left work per the agents' instructions.

As a result of his overall fears for self and freinds from being exposed and losing the favor of the Government, Vasquez made a rash decision to leave the United States for the Dominican Republic. After about eighteen months, however, he began contacting his lawyer in order to arrange a return. It was part of his understanding that the mitigating circumstances of his flight from justice would be explained fully so that he would not be penalized unduly when he returned. However, none of the mitigating facts or circumstances stated here and in Petitioner's Affidavit were ever brought into the record of this case and Mr. Vasquez was held responsible for obstruction of justice, lost acceptance of responsibility, was held responsible for the drugs of codefendants with which he had no connection, and received no benefit for his cooperation. He was prejudiced with five offense levels connected with the administration of justice and two offense levels connected with the inflated drug quantity. Finally, he was not considered for minor participant. He received a sentence of Offense Level 28 after credit for the Safety-Valve.

## STANDARD FOR EVALUATING INEFFECTIVE ASSISTANCE OF COUNSEL

The Sixth Amendment right to counsel forms the foundation upon which the entire American Criminal Justice System is based. As the Supreme Court has noted, it is by far the most significant of the defendant's constitutional rights because it is the means by which the defendant asserts each of his other rights in a criminal proceeding. United States v. Cronic, 466 U.S. 648, 652 [1984].

The Courts have been given a two prong analysis for establishing the lack of constitutionally adequate representation of counsel. Strickland v. Washington, 466 U.S. 668, 687 [1984]. First, a petitioner must establish that counsel's performance fell below an objective standard of reasonableness; second, a petitioner must demonstrate that but for counsel's deficiencies the result of the proceeding would have been different "to a reasonable probability."

"A reasonable probability is a probability sufficient to undermine confidence is the outcome [of the criminal proceeding]."

Strickland, 466 U.S. at 694.

Where, as a practical matter, the reviewing District Courts have seemed to gravitate to a higher standard than "reasonable probability," and automatically deferred to the putative tactical decisions of defense counsel, the Supreme Court has acted again to return the evaluation to the true Strickland standards. Wiggins v. Smith, 156 L.Ed.2d 471 [2003] (standard remains "reasonable probability" and counsel's decisions cannot be presumed correct absent an articulable reason for the decision).

What a reviewing Court most commonly looks for is some "break-

down in the adversarial process that renders the reuslt unreliable." <u>Strickland</u>, 466 U.S. at 687; <u>United States</u> <u>v</u>. <u>Cronic</u>, 466 U.S. at 659 (question on habeas review is whether defense counsel's representation failed to subject the critical elements of the prosecution's proof to meaningful adversarial testing).

The standard for prejudice sufficient to be cognizable on § 2255 Applications has been defined by the Supreme Court to be the imposition of "any unwarranted term of imprisonment." <u>Glover</u> <u>v</u>. <u>United States</u>, 531 U.S. 198, 292 [2001]. This standard of prejudice is only lately really being used; but it is the correct standard for this review and not the old standard in cases like <u>Knight</u> <u>v</u>. <u>United States</u>, 37 F.3d 769, 772-73 (1st Cir. 1994).

I.    THE DEFENDANT WAS UNCONSTITUTIONALLY SENTENCED TO AN INFLATED
      DRUG QUANTITY DUE TO THE INEFFECTIVE ASSISTANCE OF DEFENSE
      COUNSEL AT SENTENCING:

The Petitioner has added Issue III, which also partially

involves the issue of this same excess drug quantity on procedural

and substantive grounds.  Blakely v. Wahington, 540 U.S. ___, 124

S.Ct. 2531 [2004].  However, the Defendant also possesses this more

traditional argument.

Mr. Vasquez freely admits to his responsibility for the 26 grams

of cocaine that he retrieved from the spare apartment for the infor-

mant.  And he acknowledges that shortly before that time he became

aware about a week before this event that Mr. Ventura was storing his

cocaine at the apartment.  However, his residency in the apartment

was in no way predicated on participating in Mr. Ventura's business.

And in no other way did Mr. Vasquez participate in the conspiracy but

for silence (misprison of felony) once he found out and the one

delivery done as a favor described above.

Where the scope of Mr. Vasquez' participation otherwise was only

misprison, it was legally wrong for him to be blamed at sentencing

for the drugs recovered from his codefendants upon their arrest.  The

drug quantity in question is the 54.7 grams of heroin, 35.3 grams of

crack cocaine, and the 6.73 grams of cocaine powder.  By no measure

was Mr. Vasquez ever involved with heroin or crack cocaine.

At sentencing Mr. Vasquez was entitled to a particularized

determination of not only what he could foresee as activities of the

conspiracy but the determination of the scope of his agreement to be-

come involved.  U.S.S.G. § 1B1.3, Commentary Note  2.   There has

been a completely uncritical overgeneralization that Mr. Vasquez was

the standardized participant to a drug conspiracy. While the Court credited his participation as minor, it still was making him an overall particpant in the case. The acquiescence of counsel to this characterization was below the standard of advocacy required for constitutionally effective Guideline sentencing. The disparity of the representation to what was constitutionally required can be appreciated from a comparison of the Government description that forms the record and what Mr. Vasquez was always able to say.

Mr. Ricciardi:  . . . .

> First of all, not only did he tell them of his role in that investigation which was, I suggest, a very limited role. He came into that investigation toward the end of the window, I would suggest, and he became a pawn in the investigation the D.E.A. was conducting here in Worcester very late in the investigation. He happened to come into it because of a break-up of a relationship which led him to another relationship with Becky Alvarado and her husband. They had been clients of his, and they took him in during the brief period of time. That's when he became involved in this illegal activity. He had no involvement in the activity prior to that point in time.

Sentencing Transcipt, p. 4. After this very ad lib description of the Defendant's offense conduct, counsel moves to his post-arrest experiences and never returns to the fact of the case. And so this is the entirety of what was available to argue on direct appeal.

As described now on Petition (Relevant Background and Affidavit), this Court can see that the actual facts are much more complicated and mitigating. Where the defense left the Court to presume or even speculate on Mr. Vasquez' reasons for joining the conspiracy, and

most likely imagining drug greed, the actual story shows that "join-ing" was the unforseen result of a backhanded favor from Mr. Ventura. Initially, Mr. Ventura probably thought Mr. Vasquez would be a good foil for the otherwise unoccupied apartment. He only revealed that the apartment was his stash house when practical needs made secrecy impossible. Affidavit, ¶ 5.

Less than one week later, Mr. Ventura was able to parlay Mr. Vasquez' feelings of friendship, loyalty, and obligation, and now knowledge, into the free favor of solving a delivery problem. Affi-davit, ¶ 6. This event was not a circumstance that ever became generalized or expected and Mr. Vasquez returned to doing nothing besides the misprison of felony for the twelve intervening days after the delivery until the arrests.

Thus, when the Government blamed Mr. Vasquez for the drugs seized from his coconspirators upon their arrest, it knew by that time that this drug quantity was entirely gratuitous vis a vis him with respect to the scope of his participation. His actual one participation in a delivery had been due exclusively to accidental circumstances; the remainder of Mr. Vasquez' participation had been his passive silence over what he knew. Indeed, he was oblivious to whatever Mr. Ventura was specifically doing on the day of arrest.

This is one of the most minimal conspiratorial involvements ever encountered in F.C.I. Fort Dix writ writing. The Petitioner's membership was de facto foisted on him after he had naively taken up residence with all his belongings. The Defendant admits to having used cocaine socially; but that does not equate with dealing. If his disposition was a factor, it probably disposed Mr. Ventura to to trust him with the knowledge of the real purpose of the apartment.

The fact that anything beyond that knowledge happened was the result of serendipity.  Had the Defendant had an alternative place to live, had the Defendant been immediately successful in finding a Boston-area apartment, he would not have been a participant at all ever.  He was working diligently toward obtaining his own place to live even before knowing the true use of the Worcester apartment; events just did not move quickly enough.

As a result of counsel arguing none of these facts, this was not a preserved issue for direct appeal.  But counsel was constitution-ally ineffective in general for not analyzing the scope of Mr. Vas-quez' agreement to particpate as required by U.S.S.G. § 1B1.3.  It is established across the Circuits that for defense counsel to be objectively effective, he is obligated to be familiar with Sentencing Guideline law.  E.g., United States v. Day, 969 F.2d 39, 42-44 (3rd Cir. 1992) (seminal case so holding).

Even if the Government had argued, and the defense had conceded, that Mr. Vasquez had known about the excess cocaine, heroin, and crack in general, it was still obligatory upon the Government to prove that he possessed a drug distribution interest as the scope of his involvement in the conspiarcy.  The competent defense would have argued that Mr. Vasquez was fully occupied with his regular life, going through a separation and divorce, commuting over one hour each way to a job, trying to impress a new employer, and seeking to find an affordable apartment near work.  He was eating offered meals whenever possible.  If this Court appreciated the time demands on the Defendant during the arguable nineteen days of his involvement, it would have sentenced Mr. Vasquez to Offense Level 14 (26 grams)

for his one act of active participation.

The failure to make this argument was a solitary defect that has devastated the defense. E.g., Quartararo v. Fogg, 679 F.Supp. 212, 248 (E.D.N.Y.), aff'd, 849 F.2d 1467 *2nd Cir. 1988). Now that the Defendant understands the law, he cannot see any viable strategic reason that would justify counsel's silence. Whatever strategy could be identified, even now, would not justify this omission of advocacy. DeLuca v. Lord, 858 F.Supp. 1330, 1346 (S.D.N.Y. 1994), aff'd, 77 F.3d 578 (2nd Cir. 1996), cert. denied, 519 U.S. 824 [1996] (well-intentioned and earnestly pursued strategy, honestly believed to be in best interest of client, can still be objectively ineffective).

Mr. Vasquez will go through life with the stigma of this conviction. When he has to explain himself to future employers, he is constitutionally entitled that the recorded story be the true story. United States v. Tucker, 404 U.S. 443 [1972] (criminal defendant is entitled to be sentenced on the basis of only truthful information and the valid inferences derived from that information).

Wherefore, the Petitioner prays that the Writ will issue for this ground for relief and that he will be resentenced without the relevant conduct described.

II.    DEFENSE COUNSEL WAS CONSTITUTIONALLY INEFFECTIVE FOR FAILURE
       TO RAISE ANY MEANINGFUL ARGUMENT THAT MR. VASQUEZ WAS STILL
       ENTITLED TO ACCEPTANCE OF RESPONSIBILITY AFTER FLEEING HIS
       SENTENCING, BUT LATER VOLUNTARILY SURRENDERING:

On this issue the Government also in essence received a "bye"
from Defense Counsel.  Counsel should have argued that Mr. Vasquez
still had a substantial entitlement to credit for acceptance of re-
sponsibility for special circumstances.  It was again a consitution-
ally ineffective lapse in counsel's objective duty of advocacy to
not place the real facts and applicable law before the Court.  See
Tucker, supra.  The argument presented here provides the Court
with facts that it never heard; if those facts are persuasive, these
are the same facts that were available at sentencing.

Mr. Vasquez' real problem was that there was no work for him
in New Haven, where the Government was obliging him to live.  But
there was work in Massachusetts.  He knew that he was doing wrong
by going to Massachusetts; but dealing with bureaucracy, where every-
thing becomes a problem because the person giving permission becomes
responsible, appeared impossible compared to the relatively simple
idea of going to Massachusetts secretly.  So Vasquez got the job
described in the Affidavit secretly.  Affidavit, ¶ 8.  He worked for
eight months, until someone turned him in.

When the agents came, they totally destroyed Mr. Vasquez' anon-
ymity.  As described, they had his personnel file in hand when they
took him into the office.  It was a virtual certainty to him that he
would be terminated and go to prison without the good will of the
Government.  But, more importantly, he was roiling with suspicions
of betrayal.  And even more significant to him was the gossip he was

hearing even before he left Osmonics that day.

Then, when Mr. Vasquez went to his girlfiend, he probably receiv-ed advice tainted with ulterior motive; the girlfriend bought his $14,000 for $5,000 cash.  In the pressures of the moment, the Peti-tioner made a rash and wrong decision.

Mr. Vasquez' flight was certainly no renunciation of his admis-sion of guilt.  And it was no renunciation of remorse, either.  Whe-ther correct or not, Mr. Vasquez rationalized himself as coping with radically changed circumstances and only having hours to act.  What he was feeling was the embarrassment and humiliation of having been confronted essentially in public over things that he treated as very secret.  None of this was any reaction to accepting responsibility for his crime.  He did not know in which direction events would go from his meeting with agents, both personally and in his family, and he could not keep a lid on affairs the agents had started.

Mr. Vasquez regretted having fled the country almost immediately. His decision was never any first choice.  But he felt trapped by the irreversibility of having physically left the United States.

Eventually, when the real significance of a lifetime away from family and of the personal embarrassment he was causing his family began to impress the Petitioner, he could no longer rationalize what he had done.  The thoughts that there had been possible danger looked more and more remote.  Vasquez now chose to try to correct the wrong he had done and called his defense counsel.  Discussions went on be-tween Mr. Vasquez and Mr. Ricciari for two months, with Mr. Ricciardi reporting no news from the Government each time.  Affidavit, ¶ 14. After about eighteen months, however, the Government set conditions

and Mr. Vasquez returned to the United States.

This is the full story which should have been told at sentencing. And there is Circuit law which would direct counsel seeking to pre-serve acceptance of responsibility for a client who has committed obstruction. United States v. Talladino, 38 F.3d 1255, 1262-63 (1st Cir. 1994). The essential requirement is that the defendant's cir-cumstances be "extraordinary." But, if extraordinary, the Court is obliged to award the full acceptance of responsibility credit. Id. at 1263.

The Talladino Court also held that the determination of whether to grant acceptance of responsibility is necessarily a fact-dominated issue for which the District Court must be given all the facts. Here the Court heard next to nothing of the facts now presented in Mr. Vasquez's Affidavit. Other Circuits have held that bare-bones facts are insufficient to make an informed discretionary decision. United States v. Harper, 246 F.3d 520, 526 (6th Cir. 2001), cert. denied, 534 U.S. 896 [2002]. And the Court needed to hear these facts most importantly from Mr. Vasquez himself if it were to evaluate sincer-ity.

What was reported was only what the Probation Department cred-ited of his post-surrender statement. Mr. Vasquez did say he was homesick. But he also said that he believed his actions were embar-rassing his family. Knowing that he was facing worse than when he left, Mr. Vasquez nonetheless freely chose to return, even when it required persistence on his part to get Government interest and he would have every reason to reacquire cold feet.

The Government counterpoint dramatized its characterizations

13

to compensate for a complete lack of facts: He "violated the condi-
tions of his release in a fundamental way" tells nothing of the why
the Defendant was working at Osmonics.  And there are far more funda-
mental ways to violate conditions of bail than working out of state
in order to be working.  And if agents did not intend to "out" Mr.
Vasquez, like a recent C.I.A. agent, they would have used far more
tact than showing up at Osmonics four strong and demanding his per-
sonnel file.  The circumstances prompting Mr. Vasquez' flight were
extraordinary to him and should be to this Court.  The Government
criticisms are wholly categorical and conclusory; the Petitioner's
description is reflective.

The Government's allowance of bail in this case was wholly self-
serving and Mr. Vasquez fulfilled the quid pro quo.  Prisoners see
far more examples of Government treatment of cooperators than the
Courts do.  One being written about this week is that of Ainsley
Chance, whose family was duct-taped and held hostage for money and
intimidation which prompted him to flee to Jamaica, where he was
shot in both legs.  The Government, at his sentencing, claimed it
had no responsibility.

While this case is not that extreme, the story was much more
balanced in Mr. Vasquez' favor than the Court could have even specu-
lated at his sentencing.  It was a deficiency of defense counsel that
none of Mr. Vasquez version of events was ever told and he never
got the opportunity to explain to the Court and seek leniency.  At
the conclusion of the drubbing, the Defendant was too nervous to
address the Court.  Clearly, the ground had not been prepared for
him to be able to say anything.

14

Even at this point, however, Mr. Vasquez could have expressed his remorse, which he did have, and asked for leniency. <u>United States v. Shultz</u>, 917 F.Supp. 1343 (N.D. Iowa 1996) (acceptance is based on recognition of and remorse for wrongful conduct, not on collateral matters like whether defendant pled guilty or stood trial; those facts are evidence, not determinative). By his voluntary return and surrender, Mr. Vasquez had expressed both recognition and remorse. His remorse was not some abstract remorese for a sovereign, but for his family, friends, and self. There is nothing corrupt about being remorseful because you want your life back some day.

The Writ should issue or in the least measure this Court should hold an evidentiary hearing to correct the shortcomings of the record.

III.    THE DEFENDANT WAS UNCONSTITUTIONALLY SENTENCED TO RELEVANT
        CONDUCT AND OBSTRUCTION OF JUSTICE ENHANCEMENTS THAT WERE
        NEVER CHARGED TO THE GRAND JURY OR PROVEN OR ADMITTED
        TO THE COURT OR TO A PETIT JURY BEYOND A REASONABLE DOUBT:

At Mr. Vasquez' sentencing in this case, the standard for proof
of any incremental sentence increase, other than the pure sentence
for the specific offense of conviction, was preponderance of the
evidence to the satisfaction of the District Court.  Since sentenc-
ing, there has been a sea change in sentencing jurisprudence where
Mr. Vasquez believes that he can argue that sentencing law has either
seen a beneficial watershed procedural change or substantive change.
Procedurally, the standard of proof of any fact which translates into
penalty has been held to be proof beyond a reasonable doubt as found
by a jury.  Blakely v. Washington, 540 U.S. ___, 124 S.Ct. 2531, 2537
[2004].  Substantively, those facts are now recognized as elements.

Two aspects of this sentencing were not found to the Blakely-
articulated requirements:  (1) the culpability for drugs in the con-
spiracy beyond the 26 grams that the Petitioner delivered, and (2)
the two offense level enhancement for obstruction of justice.  If the
Government failed in its due process burden of providing the neces-
sary proof, and Mr. Vasquez' first issue already makes that argument
to preponderence standards, then there are double jeopardy considera-
tions which would have to be resolved before any resentencing,

When the error complained here is present, the Ninth Circuit has
rightly observed that the arguments of Issue I are moot.  United
States v. Ameline, 380 F.3d ___, ___ (9th Cir. 2004) (if Mr. Ame-
line's procedural contentions are correct, his substantive arguments
are mere surplusage).  However, Mr. Vasquez must make a full argument
that Blakely v. Washington is retroactive on collateral review.

16

A.  Cause And Retroactivity Of <u>Blakely</u> v. <u>Washington</u>:

Section 2255 petitioners are forced by the lack of precedent before their A.E.D.P.A. deadlines to analyze <u>Blakely</u> v. <u>Washington</u>, 540 U.S. ___, 124 S.Ct. 2531, 159 L.Ed.2d 403 [2004], for whether it satisfies the showing of cause required for bringing an argument on collateral review.  <u>United States</u> v. <u>Frady</u>, 456 U.S. 152, 162 [1982] (a petitioner who has failed to argue an issue in earlier proceedings <u>must</u> give a justifiable reason in law for his waiver).

1.  Cause:

The First Circuit has ruled that <u>Apprendi</u> v. <u>New Jersey</u> does not apply to the United States Sentencing Guidelines.  E.g., <u>United States</u> v. <u>Caba</u>, 241 F.3d 98, 100 (2001). When this criminal case came on for adjudication, defense counsel were constrained to follow Circuit law, i.e., the rules or statutes firmly adopted or established when a criminal defendant must resort to them.  <u>Ford</u> v. <u>Georgia</u>, 498 U.S. 411 [1991].  The evolution of law due to <u>Blakely</u> will satisfy cause for a failure to argue for relief in earlier proceedings.  <u>Reed</u> v. <u>Ross</u>, 408 U.S. 1 [1984]; <u>United States</u> v. <u>Garcia</u>, 195 F.3d 1278, 1284 (11th Cir. 1999) ("prior jurisprudence is no longer binding once substantially . . undermined by Supreme Court juris-prudence").

The <u>Apprendi</u> arguments against the determination of this sentence would have prevailed were the sentencing findings not otherwise made to the wrong standard of proof and to the wrong factfinder.

> "Any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt."

Blakely v. Washington, 124 S.Ct. 2531, 2537 [2004]. But in the face of universal denial of every attempt to require Apprendi-styled relief to Sentencing Guideline subject matter for now four years, no defendant can be held to have willingly waived the Apprendi argument applied to the Guidelines.

> "The situation is different when a supervening de-
> cision alters settled law [as here]. A defendant
> clearly has no duty to object [to law] that is
> based on clearly established circuit authority.
> He cannot be said to have 'forefeited a right'
> by not making an objection since at the time
> no legal right existed. If we were to penalize
> defendants for failing to challenge entrenched
> precedent, we would be insisting on an omniscience
> on the part of defendants about the course of the
> law that we do not have as judges."

United States v. Viola, 35 F.3d 27, 42 (2nd Cir. 1999). Mr. Vasquez made his Apprendi argument at the first instance permitted, but to no avail.

    2. Procedural Retroactivity:

The Supreme Court has created two exceptions to the bar on applying new rules of procedure retroactively to criminal cases which are already legally final per Griffith v. Kentucky, 479 U.S. 314, 321 n. 6 [1987] (defining legally final as the end of direct review or the possibility of direct review). The exceptions were explained in Teague v. Lane, 489 U.S. at 311 (plurality opinion made majority in Penry v. Lyanugh, 492 U.S. 302 [1989].

Repeat of the Teague discourse is hardly necessary among litigants. Blakely satisfies the "new rule of procedure implicit in the concept of ordered liberty" exception; it can find its decisional roots in the Common Law treatment of crimes before there

were even statutes. <u>Teague</u>, 489 U.S. at 311. Where <u>Blakely</u> did
not order retroactive application, however, for procedural grounds
a petitioner must go further than demonstrating that the change is
fundamental and also demonstrate that retroactivity is demanded by
the inherent consequences to earlier precedent.

In <u>Tyler</u> <u>v.</u> <u>Cain</u>, that majority Court agreed with Justice
Breyer's analysis that the Supreme Court can have made a rule
retroactive over the course of two cases.

> "Multiple cases can render a new rule retroactive
> only if the holding in those cases necessarily
> dictates retroactivity of the new rule."

<u>Tyler</u> <u>v.</u> <u>Cain</u>, 533 U.S. 656, 665-66 [2001], citing Breyer, J., 533
U.S. at 672-73. Under this analysis, <u>Blakely</u> does not define the
rule; it only defines another context for a pre-existing rule.

At the simplest level of analysis (and not decisive to this
case), <u>Blakely</u> reverses the erroneous Circuit decisions that
<u>Apprendi</u> <u>v.</u> <u>New</u> <u>Jersey</u> did not apply to sentencing guidelines, ef-
fectively stripping <u>United</u> <u>States</u> <u>v.</u> <u>Caba</u>, <u>supra</u>, of precedential
authority. Thus, <u>Blakely</u> absolutely enforces the <u>Apprendi</u> rule
retroactively upon all cases that were not legally final on June
27, 2000.

In the deeper analysis, in order to be fully retroactive with-
out any timing restraint, the critical principle is that the new
rule must be shown to be <u>essential</u> to enforcing two fundamental
constitutional protections of the criminal justice process:

> (1) the fundamental fairness of the procedure. <u>Mackey</u> <u>v.</u>
> <u>United</u> <u>States</u>, 401 U.S. 667, 675-702 [1971] (Harlan,
> J., concurring) (emphasizing fairness protection); and

   (2) the fundamental accuracy of the proceeding involved.
    Saffle v. Parks, 494 U.S. 484, 495 [1990], citing back
    to Teague v. Lane, 489 U.S. at 312, and to Justice
    Harlan in Desist v. United States, 394 U.S. 244, 256-
    69 [1969] (Harlan, J., dissenting) (emphasizing ac-
    curacy protection).

Clearly, the concepts are not isolable from one another. But the
effects of a rule can be assessed for the stress of its impact on
the equity of the procedure toward the opposing litigants and for
faith in the absolute certainty of the final result.

Schriro v. Summerlin has settled any question whether Apprendi
jurisprudence implicates fundamental constitutional concerns. It
does. Schriro v. Summerlin, 2004 WO 1402732 *3 [June 24, 2004]
(acknowledging the Ring v. Arizona issues to be "fundamental"). It
then noticed that the "right to jury trial is fundamental to our
system of criminal procedure." The advantages in twelve fact-
finders toward offsetting oversight or bias toward the result and
to unanimity of decision preventing a false majority are inherent
in the American guarantees to jury findings of culpability.

The Schriro Court held that the Ring rule for capital sentenc-
ing did not apply retroactively because it did not seriously
enhance the accuracy of the sentencing for this penalty decision to
be made by judge instead of by jury. Schriro, 2004 WL 1402732 *5
(noting that the evidence that "judicial factfinding so 'seriously
diminishes accuracy' . . is simply too equivocal"). In Ring, the
Arizona courts were already required to find aggravating factors
beyond a reasonable doubt. So this factor was not in controversy
here. It is in all ordinary Guideline sentencings.

Thus, procedural retroactivity of the Apprendi rule to Mr.
Vasquez' case is established. He satisfies the requirement that

20

his guilt to facts producing aggravation of his basic sentence compared to the offense of conviction,   performed by the Court alone to a preponderance of the evidence standard, was procedurally wrong.  Mr. Vasquez guilt of the "collateral" factors such as the majority of the drug weight in this case and obstruction of justice must be found by a jury to jury standards.  After all, the relevant conduct of his co-defendants' crimes is legally other crimes entirely.  This is the substantive result of analyzing Blakely v. Washington further.

      3.  Substantive Retroactivity:

The retroactivity and cause issue has to be addressed fully in any honest analysis.  Petitioner submits that Blakely forces a sub-stantive re-interpretation of Sentencing Guideline law which is constitutionally required to be held retroactive in effect. Because no one is doing it, the Petitioner provides a detailed analysis, which demonstrates how far sentencing law had strayed from Constitutional principle.

The purpose of the criminal law is the redress of torts which either are too significant in their import to be the concern of anything less than all of society or which, by their nature, offend the whole of society.   Blackstone, Commentaries On The Laws Of England, . 235 ( 3 ed.  1875 ).  Primitive thinking generated primi-tive methods of redress; even today, the implicit standard for equity is "an eye for an eye."

But where the consequences of felony conviction were so dire in Common Law, irreversible even, there was a great deal of atten-tion given to guaranteeing the truth of the facts used in justifi-cation of imposing any punishment at all.  The protection of the

accused began with notice of all the essential accusations from
which he must defend, i.e., the exact crime charged.

> "This authority establishes that a 'crime' in-
> cludes every fact that is by law a basis for
> imposing or increasing a punishment."

Apprendi v. New Jersey, 530 U.S. 466, 500 [2000] (Thomas, J., con-
curring).  This protection of the citizen was considered so elemen-
tal that the denomination of the crime charged, or later statutory
offense created, had to include every fact that collectively qual-
ified the crime.

> "An accusation which lacks any particular
> fact which the law makes essential to the
> punishment is . . no accusation within the
> requirements of the common law, and it is
> no accusation in reason."

Blakely, 2004 LEXUS 4573 * 4, quoting I.J. Bishop, Criminal Proce-
dure, § 87, p. 55 (2d ed. 1872).  The punishment could only go so
far as the essential elements accused in advance of trial.  The
citizen was substantially protected by knowing the exact definition
of the crime accused.

As offenses all came to be charged by statute, the protection
of the accused from surprise accusation was secured through the
boundaries of the statute:  what it possessed for essential
elements and what it explicitly fixed for penalties.  United States
v. Evans, 333 U.S. 483 U.S. 483, 486 [1948].  The procedural right
to have the elements, essential to justifying the penalty imposed
upon a conviction, proven to a twelve-person jury to the standard
of beyond a reasonable doubt is tied to the definition of the crime
and has become axiomatically identified as the American principle

of justice.

> "Where one party has at stake an interest of
> transcending value [his physical liberty], this
> margin of [making a factfinding error] is reduced
> as to him by the process of placing on the [Gov-
> ernment] the burden of . . persuading the fact-
> finders by the conclusion of trial of his guilt
> beong a reasonable doubt."

In re Winship, 397 U.S. 358, 264 [1970].  This right attaches to

proof of guilt to any statutory offense.

With this understanding of the substantive protection afforded

to an accused at his trial by the requirement of charging him by

statute, the Supreme Court analyzed the Washington State Guidelines

and de facto found them unconstitutional for circumventing the

protections owed the defendant through his State's statutes.  Mr.

Blakely had plea bargained to avoid being convicted and punished

for aggravated kidnapping in the first degree.  At sentencing, he

found himself being sentenced in fact for the first degree crime.

Leaving aside the procedural protections (jury factfinding to

beyond a reasonable doubt), the circumvention had been to treat the

fact of alleged "deliberate cruelty" as something else besides an

essential element to the conviction for the actual crime.  Had the

sentencing scheme been purely statutory in labels, this error could

not have happened by definition.

> "Much turns on the determination that a fact
> is an element of an offense rather than a
> sentencing consideration, given that elements
> must be charged in an indictment, submitted to
> a jury, and proven by the Government beyond a
> reasonable doubt."

Jones v. United States, 526 U.S. 227, 232 [1999] (addressing sub-

clauses to 18 U.S.C. § 2113, carjacking, as separate crimes).

This relevant conduct problem to the Guideline approach to sentencing was recognized in a Memorandum Opinion as long ago as 1991. Kinder v. United States, 119 L.Ed.2d 214 [1991] (Stevens, J., dissenting from denial of certiorari to consider sentencing defendant for counts dismissed per a plea bargain). But nothing was ever done to address the question expressly.

Nonetheless, the Supreme Court accidentally resolved the question in 1992 when it held:

> "The answer to any suggestion that the statutory character of a specific penalty provision gives it primacy over administrative sentencing guidelines is that the mandate to use the Guidelines is itself statutory."

United States v. R.L.C., 503 U.S. 291, 299 [1992] (resolving status of guideline-applicable "maximum" to that of 18 U.S.C. § 5307(c).

Blakely v. Washington procedurally enforces what should have been enforced for offenses alleged to be aggravated all along. Yet Justice O'Connor seems surprised when she discovers:

> "Under the majority's approach, any fact that increases the upper bound on a judge's sentencing discretion is an element of the offense."

Blakely, 2004 U.S. Lexus 4573 *14 [2004]. It should never have been otherwise.

Clearly, defendants are entitled to retroactive correction based on the correct definition of a sentencing guideline as a full statute. Under the Supreme Court's R.L.C. interpretation of the Federal Sentencing Guidelines as criminal statute or the legal

equivalent of statute for purposes of defining the statutory maxi-
mum sentence, that clarification was fully retroactive in effect.
Solemn v. Sturmes, 465 U.S. 638, 742 [1984] ("as a rule, judicial
decisions apply 'retroactively'"). As the Supreme Court found for
Petitioner Bunkley in Bunkley v. Florida,

> "[A]pplication of the due process principles
> of [R.L.C.] may render a retroactivity analysis
> unnecessary. . . The question here is not
> just one of retroactivity. Rather, retroac-
> tivity is not at issue if the [Supreme Court's]
> interpretation of [guideline maximum being the
> legal equal to statutory maximum for due process
> purposes] is a correct statement of the law."

Bunkley v. Florida, 538 U.S. 835, 840 [2003] (transliterating that
substantive "length of blade" holding to substantive "guideline
definition" holding). And, as Bunkley held, the first legally
correct interpretation of a substantive law must be retroactive on
collateral attack. Id. at 841.

Richardson v. United States, 526 U.S. 813, 820 [1998],
restated the maxim that different legal consequences attach to
facts that are elements as compared to being mere evidence. That
difference is established here: the Sentencing Guidelines present
essential elements and not legal-fiction "sentencing factors." The
legal result is that this Court must vacate and reverse any penalty
imposed to the Constitutionally erroneous standards for elements.

## CONCLUSION

For the reasons, evidence, and arguments advanced in this Petition, the sentence in this criminal case should be vacated, the case set down for further proceedings, and the Defendant resentenced without the relevant conduct of his co-defendants and without the obstruction of justice enhancement until such time as the Defendant agrees to admit to its correctness.

Respectfully submitted,

Pugel J. Vasquez, Pro Se
F.C.I. Fort Dix, Unit 5751
P.O. Box 2000
Fort Dix, New Jersey 08640-0902