IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

PUGGI VASQUEZ,
      Petitioner

v.

04-40205 NMG

UNITED STATES OF AMERICA,
      Respondent

**AFFIDAVIT IN SUPPORT OF § 2255 APPLICATION**

I, Puggi Vasquez, depose and swear under oath the following statements pursuant to 28 U.S.C. § 1746:

1. I am the Defendant in the above captioned criminal case and the statements of fact that I make here are of my own personal knowledge unless I attribute the source of my knowledge elsewhere.

2. I met Rafael Ventura when he was referred to me by members of my ex-wife's family as an insurance customer. Because he insured seven cars and frequently made payments in person, I saw him much more often than I would an ordinary customer. I also saw him in some of the same clubs where I socialized. We became friends.

3. Eventually I came to appreciate that Rafael sold cocaine. I bought personal use amounts from him on the occasions when I wanted to use it socially.

4. There came a time in 1998 that there were major changes in my life. My wife and I separated and I had to move out with my furniture and belongings. At the same time I was applying for a better job in Boston. When I mentioned to Rafael that I needed temporary storage to cope with everything, Rafael volunteered that

he had an apartment that was temporarily unoccupied where I could live for a while and store my possessions. I thought I would only need the apartment for a week or two until I could find an apartment in Boston. And saving the money in the interim seemed important, too. So I was grateful for the offer and accepted.

5. Finding an apartment in the Boston area proved difficult and I continued to live in Rafael's apartment past the two weeks. One day Rafael came to the apartment. I thought he was just visiting; but shortly after coming in, he went to the refrigerator and removed a baggie hidden in the body of the refrigerator behind the insulation on the door. He apologized for having to retrieve it right in front of me; but he said he had a customer who was waiting. I was very surprised and a little offended that he had not at least told me about the drugs hidden in the apartment. I would not have felt good about living in a stash house. But now I also owed him respect for the favor. So I rationalized that I would be out of the apartment shortly anyway and it would all be history.

6. As I explained in my proffer, almost right after finding out that there were drugs in the apartment, I picked up 26 grams of cocaine powder from the apartment one time. I was visiting at Rafael's house one night after coming back from work when he called on his cellphone to say that he could not get home. He asked me the favor of retrieving a package, which he described, from the apartment for the person who was already there and bringing it back to his wife. I did it and the customer was the informant. Shortly thereafter, I was indicted.

7. After I surrendered, the Government insisted that I reside in Connecticut as a condition of bail. This meant giving up my

2

better job in Boston. I found employment in another insurance agency in New Haven. About one year later, the agency had layoffs and I was let go because of my low seniority.

8. For me the job market in Connecticut was bleak. So I was very hopeful when my ex-wife told me about jobs opening up at Osmonics, a high technology membrane company, in Worcester. I was hired and in two months I had been promoted from manufacturing to a technician job in research and development. I used the name and social security number of a person whom my ex-wife knew and who had returned to the Dominican Republic.

9. I rationalized going into Massachusetts by saying I would only be at work and the agents had had me come into Massachusetts to make buys in the three cases they developed. I needed the job and I figured that I could keep a low profile. There was never a problem.

10. Agents came to Osmonics one day and called for me to come to the lobby. They had my personnel file and asked me questions for about one half hour. In the end, they told me that they were not going to arrest me, but that I should leave immediately and go back to Connecticut and wait for a phone call while they informed the U.S. Attorney and the Court of the situation.

11. When the agents left, I had to tell my supervisor that I had to leave. I did not tell him the reason, but I could already hear the buzz from all the Spanish-American workers that the visitors had been police. There was already further buzz that I was an informant and that really bothered me.

12. I left the building not knowing what to do. I went to a girlfriend and told her my problem. When we talked, I realize now, she wanted my car. At the end of our conversation, I believed that

the least harmful solution for myself and my family left behind would be for me to disappear out of the country. I sold the girlfriend the car cheap for cash and left the country from New York to the Dominican Republic.

13. Once there, I earned a decent living by doing translation and document preparation and work like this. After I had been in the Dominican Republic for about one year, the novelty and danger of my old situation began to wear off. But I still thought that my actions had been irreversible. I did not work up the courage to call my old lawyer for another six months. When I did, I was resolved to return to the United States if the terms would be at all tolerable. Naturally, my hope was that somehow I could be forgiven, but I realize now that was impossible.

My greatest concern was for my physical safety and that of my family members. I did not think that the agents appreciated the real danger of revenge had created by coming to my work the way they had. In the Dominican community, I know that suspicion is enough to make a person act and the story at work of the Government asking to see me had been the hottest type of gossip.

14. My lawyer promised me everything to get me to come back. I called him weekly for two months solid only to have him tell me that no one at the Office of United States Attorney was getting back to him. I called less often for the next four months; then things were worked out in less than a week.

15. I do not consider myself to be any real participant in Rafael's drug conspiracy. But I do see how it is possible to be drawn into conspiracy just by repaying favors. I personally and sincerely regret ever having flaunted the law and I equally regret

4

ever having used cocaine. In prison, I have witnessed the depths to which cocaine use has led some peoples' lives.

16. I expected the foregoing story to come out for sentencing. I also expected to be able to tell the Court that I did not leave the country out of my fear of going to prison without the Government's good will alone, but as much because I thought I would be keeping my family and friends from possible harm as well. It had nothing to do with me renouncing responsibility for my offense and, in fact, facing up to that responsibility is why I came back rather than live the life of a fugitive.

                                          Further The Deponent Says Not,

                                          Puggy Vasquez
                                          F.C.I. Fort Dix, Unit 5751
                                          P.O. Box 2000
                                          Fort Dix, New Jersey 08640-0902

September 30, 2004