IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


PUGGI VASQUEZ,
         Petitioner

v.                                    04-CV-40205-NMG


UNITED STATES OF AMERICA,
         Respondent

### TRAVERSE TO THE GOVERNMENT MEMORANDUM IN OPPOSITION

   Now comes the Petitioner/Defendant, Puggi Vasquez, Pro Se,
and travserses the Government Memorandum In Opposition in seriatim.

### INTRODUCTION

   The Government statement of the Defendant's grounds for relief
is basically correct, with the clarifications made here. Mr. Ric-
ciardi was constitutionally ineffective for allowing his client to
be held culpable for drug quantities in which he possessed absolute-
ly no interest. He was further ineffective for his failure to pre-
sent the real facts of this case, depriving his client of fair op-
portunity to establish acceptance of responsibility despite his
obstruction of justice and creating a deficient record for any fair
appellate review. Finally, it continues to be the well reasoned
position of the Defendant that the Apprendi/Blakely/Booker line of
case has created a substantive change in the law, which is wholly
retroactive on collateral review. The Government is well aware that
the Defendant was entitled to have the full and truthful facts before
this Court for its sentencing decisions. Townsend v. Sain, 372 U.S.

293 [1963] (defendant entitled to be sentenced based only on truth-
ful information and the valid inferences from that information).
The inferences clearly risk being invalid when critical facts are
excluded from the decisional process.  This is no "re-litigation"
when the Government fails to address any of the additional facts
that were not before the sentencing court, but which must be taken
as true in deciding this Petition.

FACTS AND PRIOR PROCEEDINGS

The Defendant has no dispute with the Government description
of the procedural travel of this case.  The plea agreement that Mr.
Vasquez was responsible for the equivalent of 700-1000 kilograms
of marijuana equivalent drug quantity is a contested ineffective-
ness subject.

In this section of its Opposition, the Government attempts to
posture this litigation back to the limited facts that the Defend-
ant is complaining made his original sentencing Constitutionally
defective.  Frankly, the thinness of the Government version falls
well below "Reader's Digest" standards.  This Court cannot adopt
the Government version of facts in light of Mr. Vasquez's Affidavit.
For purposes of deciding this Petition without an evidentiary hear-
ing, the Court must accept all of Mr. Vasquez's representations as
true and find them insufficient to grant him relief.  Rodriguez v.
United States, 162 F.3d 135, 148 (1st Cir. 1998)

In particular, the Defendant directs the Court's attention to
his statement of actual involvement in the activities of the con-
spriacy one time for no remuneration compared to counsel's "fell

in with bad people" open-ended description that allows the additional drug quantity. He also directs the Court's attention to the far more detailed description of his confrontation by agents on the job and the fallout from their visit. Based on these comparisons, Mr. Vasquez takes exception to the Government's conclusory description of Mr. Ricciardi's conduct of the sentencing defense as any valid "detailed argument in support of Mr. Vasquez' position . ." Opposition, p. 3. It is the Petitioner's argument that defense counsel spoke in generalities that failed to fairly present the truth and this Court was left to assume any inuendo it could imagine from the incomplete facts.

A R G U M E N T

I.    THE DEFENDANT HAS ESTABLISHED THAT DEFENSE COUNSEL
      WAS CONSTITUTIONALLY INEFFECTIVE AT THE SENTENCING
      STAGE OF THE PROCEEDINGS:

The effectiveness of Mr. Ricciardi can be decided quite directly. If the Defendant's version of facts is true, i.e., that his only participation in this conspiracy was the serendipity occasion on which he delivered cocaine to the confidential informant, then he maintains that the scope of his involvement was limited to that culpability. E.g., United States v. Colin-Solis, 354 F.3d 101, 103 (1st Cir. 2003) (defendant must receive individualized determination of culpability for drug quantity). As this Court is well aware, foreseeability alone is not the criterion. It is the scope of the defendant's agreement to participate!

This has all been presented on the opening Petition, only to be completely ignored by the Government. The parties do not dis-

3

agree one bit over the standard for objective reasonableness; the whole point is whether it can be constitutionally reasonable for defense counsel to allow his client to be sentenced to a complete legal fiction of involvement when from full proffers and now full Affidavit to this § 2255 the involvement is shown to be entirely limited to one incident of participation.

What is happening here is that the Government, with defense counsel's ineffective acquiesence, has conflated misprison of felony for conspiracy.  Mr. Vasquez is incredibly a conspirator who made no money from the conspiracy!  Yet, the whole sentencing hearing never established even that simple, but critical, point.

A.   Legal Standard:

The parties are not in dispute over the objectiveness stand-ard of ineffectiveness.  Opposition, p. 7.  The issue is now fairly defined:  did Attorney Ricciardi present the true story of this case to an adequate standard of Due Process?  If Mr. Vasquez was sentenced to a fairy tale of culpability, then he did not.

With respect to prejudice, if Mr. Vasquez' true culpability was for his one delivery because that was the full scope of his participation in the conspiracy, then his sentencing drug quantity was greviously inflated with crack cocaine, etc., with which he was never involved.   And, if the agents' lack of tact in confront-ing Mr. Vasquez at work so that he would become the subject of immediate gossip, then there were serious mitigating circumstances that this Court never considered during sentencing.

The Government is fully aware, even while it asks for pre-sumptions of counsel adequacy, that Mr. Ricciari is now expected

4

to have articulable reasons for his tactical decisions to stand
mute when in possession of these facts. <u>Wiggins</u> <u>v</u>. <u>Smith</u>, 531 U.S.
510 [2003].   The <u>Strickland</u> standards have been further clarified
and the Government Opposition fails to take this fact into account.

B.   Actual Evaluation Of Mr. Ricciardi's Performance:

Rather than address the hard facts which Mr. Vasquez has pro-
vided in his § 2255 Memorandum and Affidavit, the Government invokes
"blue sky" statements as supposedly endorsing all that Mr. Ricciardi
did.  Opposition, p. 8.  The dispute is not with the plea agreement,
although now that the Petitioner better understands the process,
the point of plea agreements is generally to place a defendant like
Mr. Vasquez where he should be in sentencing with the portrayal
that it is a gift rather than what his actual sentence would have
been anyway for a straight plea of guilty.  Nothing in the plea
agreement, except the "opportunity" to cooperate is anything that
a defendant could not have by himself from a prompt plea of guilty
and a proffer of his conduct.  That fact has to stand as obvious
after Mr. Vasquez's proffer.  Not even the Government is disputing
a single fact of his Petition.

The Petitioner admittedly self-distructed when he fled the
country.  It is doubtful whether any of the "gift givers" of this
bail have a fair appreciation of the stress of that existence.  It
is clear that Mr. Ricciardi did not, despite being told by his
client about the problems of secrecy, life out of state, poor em-
ployment opportunity, and so on.  None of those factors came out
at this sentencing.  So while Mr. Ricciardi argued vigorously, talk
is too cheap when it is without critical content.  Opposition, p. 8.

It has not been the Petitioner's position that Mr. Ricciardi was disloyal, but he was ineffective for failing to place the critical facts before the Court that would produce a different decision on extraordinary circumstances. DeLuca v. Lord, petition. Instead, he argued generally, which was objectively deficient to what was required. Otherwise, how can the Government be saying at this juncture that there was "simply overwhelming evidence that [Mr. Vasquez] did not accept responsibility for his crimes." Opposition, p. 9. How many fugatives come back on their own?

The Petitioner accepts his obstruction enhancement, if it is legal per Blakely/Booker; his exception is with the denial of acceptance of responsibility for a defendant who pled promptly to a now recognized inflated drug quantity, help authorities, had personal problems both maritally and with the disappearance of his job, was banished from him home for a year, and ultimately returned of his own accord after making an admittedly serious mistake that has harmed only him. All the defense description of these facts is too thin to be of any benefit to the defense. That is an objective defect in advocacy. The Government is not entitled to dictate the facts as it sees them; the Court must decide based on objective facts.

None of the Opposition's factual rebuttal on page 10 addresses any of the additional facts provided by the Defendant. The Government wishes this Court to decide this Petition as though the facts were frozen at those presented at the sentencing hearing. These omissions are too great for this Court to equitably pretend that the added facts do not matter. Facts like how Mr. Vasquez came

to be in the apartment are critical because they should that cir-
cumstances were foisted on him, not made as a conscious decision.
Then he was trapped by the favor extended into doing a small favor
in return that now will cost him seven and one half years of his
life.  The fact that Boston apartments in his affordability range
was also critical in explaining why Mr. Vasquez did not just leave.
The choice was to be homeless or a houseguest among friends, if
possible, or the Y.M.C.A., he supposes.  With the prospect of
finding an apartment any day, Mr. Vasquez just stayed with the
status quo.  This was not a criminal decision.  Counsel's vague
representations did nothing to deprive the Government of adverse
inuendoes when there was positive evidence against those adverse
inuendoes.

The Government next cannot seriously be blaming Mr. Vasquez
like it would blame a lawyer.  Opposition, pp. 10-11.  Mr. Vasquez
acknowledged the factual amount of drugs alleged in this case as
real; but as to his responsibility under the Government's "half
quoted" U.S.S.G. § 1B1.3(a)(1)(B) standard, he was completely in
the hands of counsel.  The Government knows that the Application
Note since 1993 has tempered the culpability of defendants from
the whole quantity "foreseeable" in a conspiracy to the quantity
that is "within the scope that the defendant agreed to partici-
pate."  Had Mr. Ricciardi applied the actual law, he would not
hve pled his client to 700-1000 kilograms of marijuana equivalent.

This is not a case where counsel was totally abject; this is
a case where the ad lib participation of counsel was constitution-
ally deficient.  Effective counsel would have written a sentencing

memorandum or otherwise gotten the facts finally presented on Petition into the sentencing record. If what got said at sentencing is typical, appeals are worthless per se because the Government writes the history it wants.

C. Prejudice:

The Government word processors need update. The standard for demonstration of constitutional prejudice was correctly set forth on Petition. United States v. Grace, 367 F.3d 29, 37 (1st Cir. 2004) (citing Glover "any warranted imprisonment" case with Strickland prejudice standard).

The Government appears to adopt the tact that the plea agreement was some form of benefit that offsets all prejudice. Naturally, to be true the comparison must be made with the anticipated result of a straight plea of guilty. Mr. Ricciardi never made any such comparison for Mr. Vasquez; rather, he became a Government salesman without any critical analysis. He sold the plea agreement purely as a positive thing, with no down side. Perhaps for many defendants this is true. But it was never true in this case, from the outset. And in the end Mr. Vasquez suffered greviously with a life on hold and then circumstances with which he could not cope.

The prejudice to the ineffective assistance of counsel exceeds considerations of just imprisonment in this case; it is unfortunate that the issues are clouded with the Defendant's flight from justice. But that flight should not become the universal excuse for finding "no" prejudice that the Government invites it to be.

Wherefore, on Issue I the Petitioner continues to pray that the Writ will be granted and his sentence vacated.

8

II.   THIS COURT'S SENTENCING WAS CONSTRAINED TO APPLY THE
      UNITED STATES SENTENCING GUIDELINES TO THE STANDARD OF
      THE BOOKER CONSTITUTIONAL DECISION BY PRINCIPLES OF EX
      POST FACTO LIMITATION ON CHANGES TO THE LAW:

The Petitioner does not follow the Government's procedural
lead in the Opposition; he has argued that the change in law
effected by Booker is in no way purely procedural and received no
rebuttal to his showing.  Now Mr. Vasquez demonstrates that he is
vested with the positive change in the law by ex post facto prin-
ciples generally.  After that showing, he further demonstrates
that the change in law affects his case substantively with respect
to the determination of his Guideline sentence maximum and the
standard of evidence required to establish the Guideline range
maximum sentence.

      A.   Basic Tenets Of Ex Post Facto:

The gravitas of ex post facto is such that James Madison was
prompted to remark that "ex post facto laws . . are contrary to
the first principles of the social compact and to every principle
of sound legislation."  The Federalist, No. 44, p. 282 (C. Ros-
siter, ed. 1961)  Alexander Hamilton described the ex post facto
prohibition as among the three protections "greater to liberty and
republicanism than any [others the Constitution] contains."  The
Federalist, No. 84, p. 511 (C. Rossiter, ed. 1961).  Modern
commentary is no less deferential.

> The prohibition "is deeply rooted in our
> jurisprudence, and embodies a legal doctrine
> centuries older than our Republic."

Landgraff v. U.S.I. Film Products, 511 U.S. 244, 265 [1994].

Four basic categories of ex post facto prohibition on govern-

ment were enumerated over two hundred years ago by Justice
Marshall in Calder v. Bull, 3 U.S. 386, 390 [1798], and, spanning
the ambit of observed situations, still serve as the paradigm of
ex post facto meaning:

> 1) Every law that makes an action, done before the
>    passing of the law, and which was innocent when
>    done, criminal; and punishes such action;
>
> 2) Every law that aggravates a crime, or makes it
>    greater than it was when committed;
>
> 3) Every law that changes the punishment, and inflicts
>    a greater punishment, than the law annexed to the
>    crime when committed; and
>
> 4) Every law that alters the legal rules of evidence,
>    and receives less, or different testimony, than the
>    law required at the time of the commission of the
>    offense, in order to convict the offender [and thus
>    authorize the potential maximum penalty annexed to
>    the unlawful conduct or status].

Ibid. (Emphasis added). Later pronouncements of the Supreme Court
give more succinct expression. Fletcher v. Peck, 10 U.S. 87, 138
[1810] ("An ex post facto law is one which renders an act punish-
able in a manner in which it was not punishable when it was
committed."). Also see Cummings v. Missouri, 71 U.S. ( 4 Wall)
277, 328 [1867] and Malloy v. South Carolina, 237 U.S. 180, 184
[1915].

The protection is so that Government will not treat people as
a chattel of the State, which is the mark of National-Socialism.

> "The [ex post facto] prohibition . . is an
> additional bulwark in favor of the personal
> security of the subject, to protect his or her
> person from punishment by legislative acts
> having retrospective operation. [    ].  The
> restriction not to pass any ex post facto law
> was to secure the person of the subject from
> injury, or punishment, in consequence of such

law."

Calder, at 390.  "The Constitution's prohibition and the judicial interpretation of it rest upon the notion that . . the criminal quality attributable to an act [i.e., conduct or status], either by the legal definition of the offense or by its nature or the amount of punishment imposed for its commission, should not be altered by legislative enactment, after the fact, to the disadvantage of the accused."  Beazell v. Ohio, 269 U.S. 167, 170 [1925]. It is the person who is being Constitutionally protected by the definitions in place.

> "Through [the ex post facto] prohibition, the
> Framers sought to assure that legislative Acts
> give fair warning of their effect and rely on
> their meaning until explicitly changed."

Weaver v. Graham, 480 U.S. 24, 28 [1981]; Dobbert v. Florida, 432 U.S. 282, 298 [1977].   When any ex post facto condition is created, "all these, and similar laws, are manifestly unjust and oppressive."  Calder at 390 (emphasis added).

   B.   Regardless Of The Source Of Ex Post Facto Violation,
        The Violation Offends Fundamental Due Process:

   It was the comprehension of the Founders that the Judicial Branch of Government would only be jus direre to the meaning of the law and the Executive Branch would be jus implere to that meaning.  The law itself would have immutable meaning.  Therefore, the ex post facto prohibition was only written into the legislative Articles.   But its importance was such that in one of the most reflective documents in the world, the ex post facto prohibition is set down twice.  Article I, § 9, cl. 3 and Article

I, § 10, cl. 1.

It is inconceivable that the ratifiers of the Constitution believed that the protection they had embodied could be circumvented by achieving the offending result through executive or judicial fiat. Even when the modern Supreme Court has attempted to claim that the judicial ex post facto prohibition is not "jot for jot" to the Calder list, it must still acknowledge that "the limitations on ex post facto judicial decision making are inherent in the notion of Due Process." Rogers v. Tennessee, 532 U.S. 451, 456 [2001]. The principle to be followed in comparing legislative "jot" for judicial "jot" is that if a

> "legislature is barred by the Ex Post Facto Clause from passage of such a law, it must follow that [the] Supreme Court is barred by the Due Process Clause from achieving precisely the same result by judicial construction."

Bouie v. Columbia, 378 U.S. 347, 353-54 [1964]; also see Marks v. United States, 430 U.S. 188, 190-92 [1977] (instance of judicial interpretation expanding the scope of a statutory offense to include additional conduct not previously identified as criminal).

Although not in issue here, when the Executive Branch has broadened the scope of a penal regulation by administrative pronouncement, ex post facto has been universally enforced on the Executive by the Courts themselves. E.g., Mersky v. United States, 361 U.S. 431, 455 [1960] (limiting scope of importation labeling regulation outright, but alternately would enforce ex post facto prohibition from prosecution).

Thus, whether the "label" given to the effective change was "interpretation" or something else, the ex post facto analysis is

always separately based on the actual effect and the fairness of
notice of any change in the law.

C.   Procedural Changes Must Be Purely Procedural In Order
     To Not Be Subject To Ex Post Facto Prohibition:

To the extent that incidental procedures were used to imple-
ment the law, that was not an ex post facto concern.  Beazell v.
Ohio, supra; Dobbert v. Florida, supra (Ex Post Facto Clause has
no application to changes which relate exclusively to a remedy or
mode of procedure).

But when the remedy or procedure crosses into demonstrable
effect on the substance of the governmental actions on the person,
it becomes no longer "purely" procedural in character.[1]   The ex
post facto "inhibition was leveled at the thing, not the name . .
under any form, however disguised.  Cummings v. Missouri, 71 U.S.
(4 Wall.) 277, 328 [1867] (emphasis added).  Certain "procedural"
changes have historically occurred which were identified on review
to increase the possible maximum punishment range that could be
imposed for criminal acts or change the ingredients of the
offense, or the acts necessary to expose the accused to greater
potential penalty.  They have universally been recognized by their
effect, and condemned.   E.g., Miller v. Florida, 482 U.S. 423
[1987].

> "[T]he Ex Post Facto Clause forbids the [gov-
> ernment] from enhancing the measure of punish-
> ment by altering the substantive 'formula'
> used to calculate the applicable sentencing
> range."

_____

[1] A new procedural rule that benefits a defendant is to be applied
retroactively to those on direct appeal.  Griffith v. Kentucky,
479 U.S. 314, 328 [1973].  There was once a Common Law practice to
benefit all prisoners affected by a positive change in law.

California Dept. of Corrections v. Morales, 514 U.S. 499, [1995].

When the Sentencing Commission amended its own Guidelines, it distinguished regularly between amendments that were purely procedural and those that were substantive.  Those that were "clarifying" were fully retroactive.  U.S.S.G. § 1B1.11(b)(1).  On the other hand, those that were substantive were never retroactive if they disadvantaged the defendant.  See, for example, United States v. Kepp, 951 F.2d 521, 526 (3rd Cir. 1991) (noting that all Circuits enforce ex post facto prohibition on all prejudicial substantive Guideline amendments and collecting those cases).

It cannot be left simply to someone's naming of the change as procedural (or today "remedial") to define what is legally occurring.    Collins v. Youngblood, 497 U.S. 37, 46 [1990], citing Gibson v. Mississippi, 162 U.S. 565, 590 [1896].  Collins goes on to point out that

>"Subtle ex post facto violations are no more permissible than overt ones. . . .  The Constitutional prohibition is addressed to laws, 'whatever their form,' which alter the nature of the offense, or increase the [authorized] punishment."

Collins, 497 U.S. at 46, quoting Beazell v. Ohio, 269 U.S. at 170 (emphasis added).  When arguments are made to the contrary of ex post facto, the fallacy is that the argument generally "fails to acknowledge that it is the effect, not the form, of the law that determines whether it is ex post facto.   Weaver v. Graham, 450 U.S. 24, 28 [1981].

The Collins Court held that "the prohibition which may not be

14

evaded [by its non-legislative origin] is the one defined by the Calder categories." Collins, 497 U.S. at 46.  Frankly, it is difficult to rationalize how judicial lawmaking could avoid any of the four "jots" without violating fundamental Due Process.

    D.  The Booker "Remedial" Decision Is Ex Post Facto:

    The Booker remedial Opinion purports to eliminate Guideline maximum sentences as any constitutionally-based limitation on the power of a court to sentence for a conviction.  The unique subtlety disguising the ex post facto violation by this part of the Booker decision is that the change effected by the Opinion operates on the Sixth Amendment protections that were just recognized by the Booker constitutional Opinion as being erroneously denied to defendants for seventeen years.  The fact that no defendant was ever constitutionally sentenced gives the entirely misleading appearance that no rights have been vitiated by a Relief Opinion that strips those rights, and the past can remain in status quo. Per all the discussion above, of course, this "appearance" can only be legally true if the change is demonstrated to be "purely procedural."  Otherwise, seventeen years of criminal defendants are entitled to the substantive sentencing protection nunc pro tunc from which they were illegally deprived originally.

    The Relief Opinion also strips the preponderance of evidence protection that had been traditionally afforded all Guideline sentencings.  While less than the sentencing protection identified as required by the Booker constitutional decision, the elimination of even this protection effects a substantive change in law for defendants whose offense occurred prior to the Booker decision.

    In order to rationalize away ex post facto constraint, the

Breyer majority portrayed its Opinion as purely an interpretation of Congress' intent in enacting the Sentencing Reform Act (i.e., "S.R.A.") of 1984. Booker, 125 S.Ct. at     . If just a pure interpretation, the Supreme Court would be articulating what the S.R.A. always meant. Rivers v. Roadway Express, 511 U.S. 298, 308 [1994]. If the true meaning of the law is therefore unchanged, just unrecognized, the logic goes, then the remedial opinion has effected no change in entitled constitutional right and has no ex post facto problem. By this logic, the past seventeen years of defendants received a windfall for having their sentences deter-mined to a preponderance of the evidence standard, even if Congress' "mistake" actually required jury proof beyond a reasonable doubt when the statutes were finally analyzed.

While appealing in certain circles, this analysis is super-ficial and wrong. First, its underlying proposition requires pure interpretation.

> "This Court will not strive to correct legis-
> lative mistakes, but will follow the intention
> as expressed."

Barnity's v. Casey's Leasee, 7 Cranch 456, 3 L.Ed. 403, 410 [1803]. The Supreme Court here has not just interpreted the S.R.A. as written. Second, the remedial opinion publishes law that was never litigated. Instead of requesting further briefing, the remedial majority adopted a pro-Government position that is decidedly left defendants unequally postured before the Court compared to the Government. James Beam B. Distilling Co. v. Georgia, 501 U.S. 529 [1991] (Due Process requires that litigants be equally postured in the court). The Supreme Court Opinion

deprived litigants of notice. And, third, the mechanism employed by the remedial majority, i.e., judicial repeal of facially valid statutes, is so substantive in its own right as to command ex post facto restraints. The only manner in which repeal of 18 U.S.C. §§ 3553(b)(1) and 3742(e) would not be ex post facto would be for the laws themselves to have been "repugnant to the Constitution" and therefore always void. Marbury v. Madison, 5 U.S. 137, 180 [1803]. No one, however, can claim this to be the case; enforcing Sixth Amendment protection at sentencing was the expectation of the world before the Breyer Opinion. Thus, on all three bases, if the changes made are demonstrated to be substantive and not merely procedural per any of the Calder criteria, then the Booker remedial decision is unenforceable on offenses committed before January 12, 2005.

> E.   The Booker Remedial Opinion Absolutely Offends
>      The Third And Fourth Calder Criteria:

Where the scope of analysis required under this subsection is itself an entire subject, the Defendant gives this topic its own full Section as the next argument.

**THE BOOKER REMEDIAL OPINION OFFENDS THE THIRD AND FOURTH
CATEGORIES OF EX POST FACTO PROHIBITION:**

When correctly analyzed, the Booker remedy absolutely effects
a fully substantive increase to the Constitutionally authorized
sentence which a federal defendant can receive for any conviction
(Calder category III) and does so for "less evidence" than would
have been required to inflict the same sentence under the Sentenc-
ing Guidelines, both as applied (preponderance) and as they should
have been applied (Booker constitutional opinion).   Calder
category IV.   Again, to avoid the chronic underanalysis that is
endemic to the caselaw now appearing on the ex post facto subject,
the Defendant explains both the legal principles and the practic-
ality of his reasoning for the conclusions stated above.

    A.   Distinction Between "Charge Offense" And "Real Offense,"
        The Unacknowledged Source Of The Problem:

Originally, sentencing for felony in Shakespearian times was
death.   This was eventually recognized as being over-simple to the
equity owed the convicted person.   The penalty for felony was
gradually ameliorated over several centuries, but the legal
fiction that the judge should be sole arbiter of sentence was
preserved into recent times.   Williams v. New York, 337 U.S. 241,
251-52 [1949] (sentence of the court basically unreviewable).

Supreme Court decisions eventually appeared which placed some
protection on the sentencing process.   Townsend v. Burke, 334 U.S.
736 [1948] (convicted defendant still entitled to be sentenced
only on the basis of truthful information); Townsend v. Sain, 372
U.S. 293 [1961] (truthful information and valid inferences from
that information).   Eventually, it was recognized that the harms

18

of an erroneous sentencing could implicate Due Process generally.

> "It is now clear that the sentencing process,
> as well as the trial itself, must satisfy the
> requirements of the Due Process Clause."

Gardner v. Florida, 430 U.S. 349, 357 [1977].   It became a
standard of Due Process that the convicted defendant receive
constitutionally sufficient sentencing protection.

> "Discretion is the facility of deciding or
> determining in accordance with circumstances
> what seems fair, just, right, equitable, and
> responsible in those circumstances."

United States v. Hawkins, 275 F.3d 420, 434-35 (6th Cir. 2001).

The remedial opinion majority implicitly seeks return to the
Williams v. New York sentencing era, which in fact no longer
exists, while continuing to exploit the "relevant conduct" concept
under the guise of the Court being authorized to consider "all
information" for purpose of sentencing.   Title 18 U.S.C. § 3663.

American trials, pursuant to the United States Constitution,
are charged-offense proceedings.   The accused defends against the
specific charges of the Grand Jury and extensive protection goes
into defining the crime against which he must defend.   United
States v. Russell, 411 U.S. 423 [1973].   In the Williams era, the
Court was at least sentencing for a highly specific crime of con-
viction, nothing like the modern era of criminal law.

Under the Sentencing Reform Act, the Sentencing Commission
set up a system which was nominally charge-offense in character.
U.S.S.G. § 1A(4), "Resolution Of Major Issues."   Its system, how-
ever, added description to "the" offense.   Ironically, the stated

goal of allowing the sentencing court to elaborate on the offense of conviction at sentencing was said to be to prevent the Government from piling on counts of indictment as a means to prosecutorially inflate the sentence for fungible conduct.    Ibid.

In practice, the Government quickly found that, with Congressionally generous statutory maximum sentences for any one count of conviction, it could secure sentences of any magnitude by importing "real offense" conduct into any available count of conviction.

> "[The] relevant conduct rule invites the prosecutor to indict for less serious offenses, which are easy to prove, and then expand them in the probation office."

United States v. Beler, 20 F.3d 1428,        [7th Cir. 1994).    It has been this opportunism rising to an intolerable level of constitutional abuse that threatened to trivialize the institution of jury trial which prompted the Supreme Court to finally act in the line of cases Jones/Apprendi/Castillo/Blakely/Shepard/Booker.[2]

The conduct being imported into the offense of conviction for sentencing was dimensionally either other crimes entirely or elements of aggravated crimes to the actual offense of conviction. The Apprendi line of cases, although couched in procedural questions, has been a general affirmation of the substantive reasons requiring procedural affirmation.    The ex post facto evaluation clearly demonstrates that the substantive consequences of the

_____

[1]  The percentage of trials in the total number of prosecutions is now something less than 3%.    United States v. Bethanhof, F.Supp.2d     ,      (D. Mass. 200 ) (presenting statistics).    In order to give the appearance that jury trial remains viable, some courts treat pre-trial motions before a guilty plea as the equivalent to the defendant having pursued "trial."    Ibid.

Apprendi line of cases is undeniable.

A major source of confusion needs to be distinguished immediately. The new Sentencing Reform Act is ex post facto to both the Guideline S.R.A. as originally implemented and to the constitutional Guidelines, which were never implemented. The discussions which follows addresses both in the interest of completeness.

B. "Real Offense" Sentencing Implicates Calder Category III:

The post-Booker S.R.A. increases the authorized maximum penalty that can legally be imposed on criminal acts or circumstances that only authorized a lesser Guideline sentence under a preponderance or a constitutionally protected S.R.A. The sentencing maximum was strictly limited to the Guideline maximum except in extraordinary circumstances. R.L.C. v. United States, 503 U.S. 201, 298 [1992] (the Guideline maximum sentence is a statutory maximum sentence because the command to use the Guidelines is statutory). Thus, every statutory maximum sentence had a potentially controlling Guideline "sub-maximum" sentence. This situation obtains regardless of the standard of proof. Infra.

The abolishment of this restriction is ex post facto under Calder category III. Dobbert v. Florida, 432 U.S. 282 [1977]; Lindsay v. Washington, 301 U.S. 397 [1937]. To qualify, an individual need not prove that retroactive application of the law actually affected the sentence he received in order to invoke ex post facto.

> "The Ex Post Facto Clause looks to the standard of the punishment prescribed by a statute rather than to the sentence actually imposed. . . Removal of the possibility of [let alone where a court was bound to] a [lesser] sentence . . operates to their detriment in

> the sense that the standard of punishment
> adopted by the new statute is more onerous
> than that of the old."

Lindsay, 301 U.S. at 401, reaffirmed in Weaver v. Graham, 450 U.S.
24, 30 [1981]:

> "Critical to relief under the Ex Post Facto
> Clause is not an individual's right to less
> punishment, but lack of fair notice and gov-
> ernmental restraint when the legislature
> increases punishment beyond what was prescrib-
> ed when the crime was consumated.

and Miller v. Florida, 482 U.S. 423, 432 [1987] (observing chal-
lenges are not limited to defendants who receive a harsher
sentence).

What was constitutionally defective to the Guidelines was the
unwholesome practice of prejudicial legal fiction, i.e., that the
person who committed one proven offense became culpable for other
offenses under the deceiving label of "procedural sentencing
rules." In reality, the Guidelines created a scheme of lesser
included and greater or aggravated crimes through just incremental
proof to the convicted statutory offense. The charge-offense was
engorged with conduct which was not convicted. But, regardless,
the conduct which could qualify to become allowable punishment was
delimited by the Guideline sentencing range for that conduct. It
is undeniable that this limitation has been removed, even if the
Courts purport to sentence defendants "reasonably." Therefore,
the Booker relief opinion is ex post facto under Category III.

The reviewing courts are greviously underanalyzing the notice
protection owed the accused vis a vis ex post facto. To a court,
they claim that announcement of the statutory maximum in the

22

United States Code is sufficient.  To date, United States v. Gray,
362 F.Supp.2d 714 (S.D.W.Va. 2005); United States v. Duncan, 400
F.3d 1297 (11th Cir. 2005); United States v. Lata, 415 F.3d 107
(1st Cir. 2005); United States v. Jamieson, 416 F.3d 538 (7th Cir.
2005).  The fallacy is that if a sentence were previously imposed
in excess of the Sentencing Guideline maximum, it would have been
reversed per 18 U.S.C. § 3742(e).  Mistretta v. United States, 488
U.S. 361 [1989].  That limitation is now expressly abolished.

    C.  "Real Offense" Sentencing Implicates Calder Category IV:

    It has been long recognized that additional facts to a crime
can be elements of an aggravated crime; and, under the Guidelines,
punishment was not just encouraged, but mandatory, for additional
crimes that the prosecution could bring to the Court's attention
with a preponderance of the evidence proof.  The Booker constitu-
tional decision analyzed this state of affairs simply for the
procedural safeguard and held that such facts had to be proved to
a jury beyond a reasonable doubt.  Booker, 125 S.Ct. at 756.  On
both levels, the relief opinion has substantially diluted the
standard of evidence to just "reasonableness."  Booker, 125 S.Ct.
at    .  It is not permissible to inflict this lower standard of
proof on defendants whose offenses occurred before January 12,
2005 because to do so violates Calder Category IV.

## CONCLUSION

The Petitioner has argued that he was never involved with the drug quantity used to inflate his sentence. His guilt is being assigned for the most abstract reasons imaginable; in the final analysis, that quantity was either for statistics or for credibility in testimony that never took place. Neither of those reasons were honest. The Petitioner should prevail on his first issue.

As a matter of strict law, the drug quantity in a case is now acknowledged in the Second Circuit to be an element of the separate drug crimes of 21 U.S.C. § 841(b)(1). United States v. Gonzalez, ___ F.3d ___, ___ (2nd Cir. August 22, 2005). If the Sentencing Guidelines were statutes when Mr. Vasquez was sentenced, then there is no material difference between the law of § 841(b) and U.S.S.G. § 2D1.1. So, if the Booker remedial Opinion is ex post facto law, then Mr. Vasquez should only receive a base offense level sentence for Offense Level 16 before adjustments.

Wherefore, the Writ should be granted for both grounds for relief and the Petitioner should be resentenced in accordance with Guideline law constitutionally applied.

Respectfully submitted,

Pugni Vasquez, Pro Se
F.C.I. Fort Dix, Unit 5751
P.O. Box 2000
Fort Dix, New Jersey 08640-0902

CERTIFICATE OF SERVICE

I hereby certify that I have mailed a true copy of the above Traverse to the Government Opposition to:

David Hennessy, Esquire, A.U.S.A.
Office of United States Attorney
United States Courthouse
595 Main Street
Worcester, Massachusetts 01608

on the 29th day of September, 2005, postage prepaid.

Pugay Vasquez